OPINION ON PLAINTIFF’S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT’S CROSSMOTION FOR SUMMARY JUDGMENT
 

 BROTMAN, District Judge.
 

 Presently before, this Court is Plaintiff United States for the Use of PCC Construction, Inc.’s Motion for Summary Judgment and Defendant Meadowbrook Insurance Group’s Crossmotion for Summary Judgment. Jurisdiction is based upon 40 U.S.C. §§ 270a and 270b.
 

 I. FACTUAL AND PROCEDURAL BACKGROUND
 

 On January 23rd 1996, Plaintiff United States for the Use of PCC Construction, Inc. (“PCC”) and Defendant The Hackney Group, Inc. (“Hackney”) entered into an agreement entitled “Subcontractor Agreement Between Contract and Subcontract.”
 
 (See
 
 Subcontractor Agreement Between Contract and Subcontract (“Agreement”), attached to Ex. B of Pl[.’s] Motion for Summary Judgment) The Agreement designated Hackney as the contractor and PCC as the subcontractor to a roof replacement project located at a military base in Fort Dix, New Jersey.
 
 (See id.)
 
 Included within the Agreement was a provision that Hackney would pay PCC the specified sum of $427,000.
 
 (See id.
 
 at Article 7)
 

 Alleging that Defendant Hackney subsequently failed to make payments specified in the Agreement, the Plaintiff brought suit against Hackney in both state and federal court. In the instant federal action, the Plaintiff seeks recovery under 40 U.S.C. §§ 270a and 270b, commonly known as the Miller Act. The Miller Act protects subcontractors involved in government contracts by requiring the general contractor to post a bond from which the subcontractor can recover in the event of the general’s default.
 

 In the initial federal complaint, filed on October 29th 1997, PCC asserted claims against Hackney as prime contractor to the project, and Defendant Meadowbrook Insurance Group (“Meadowbrook”) as surety.
 
 (See
 
 Oct. 29th 1997 Compl. at H 3) Defendant Star Insurance Company (“Star”), the company whose name appears on the surety bond, was not initially named as a party. Star was not included as a defendant to the instant action until March 15th 1999, when Plaintiff filed its First Amended Complaint.
 
 (See
 
 Mar. 15th 1999 First Amended Complaint at H 3) However, in the period between the filing of the Plaintiffs initial and First Amended Complaint, PCC obtained a $118,276.00 default judgment in state court against Hackney.
 
 (See
 
 Final Judgement by Default, dated Dec. 3rd 1998, attached as Ex. A to Pl[.’s] Br.)
 

 Shortly after receiving the amended complaint, Defendants Star and Meadow-brook (“Surety Defendants”) filed an answer and counterclaim,
 
 [1]
 
 alleging,
 
 inter alia,
 
 that a joint venture existed between Hackney and PCC which barred the Plaintiff from recovering under the bond.
 
 (See
 
 May 12th 1999 Counterclaim at 1113) In response thereto, PCC filed a motion for summary judgment, seeking enforcement of the state court judgment against Star and Meadowbrook, or in the alternative the dismissal of the Defendants’ joint venture claims. In opposition, Defendant Meadowbrook submitted a crossmotion for summary judgment, seeking dismissal from the case. This opinion addresses the issues raised in the parties’ motions.
 

 
 *515
 
 II. SUMMARY JUDGMENT STANDARD
 

 The standard for granting summary judgment is a stringent but surmountable one. That is, summary judgment is appropriate only when the materials of record “show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(c);
 
 Serbin v. Bora Corp.,
 
 96 F.3d 66, 69 n. 2 (3d Cir.1996). In deciding whether there is a disputed issue of material fact, the court must grant all reasonable inferences from the evidence in favor of the non-moving party.
 
 Serbin,
 
 96 F.3d at 69 n. 2. The threshold inquiry is whether there are “any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.”
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
 

 Supreme Court decisions mandate that a motion for summary judgment must be granted unless the party opposing the motion “provides evidence ‘such that a reasonable jury could return a verdict for the non-moving party.’ ”
 
 Lawrence v. National Westminster Bank of New Jersey,
 
 98 F.3d 61, 65 (3d Cir.1996) (quoting
 
 Anderson,
 
 477 U.S. at 248, 106 S.Ct. 2505). Moreover, once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, “its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.”
 
 Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
 
 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the non-moving party must “by affidavits or by depositions and admissions on file ‘mak[e] a showing sufficient to establish ... [that a genuine issue of material fact exists as to each] ... element essential to that party’s case.’ ”
 
 Equimark Commercial Fin. Co. v. C.I.T. Fin. Servs. Corp.,
 
 812 F.2d 141, 144 (3d Cir.1987) (declaring that a non-movant may not “rest upon mere allegations, general denials, or ... vague statements”). Thus, if the non-movant’s evidence is merely “colorable” or is “not significantly probative,” the court may grant summary judgment.
 
 Anderson, 477
 
 U.S. at 249-50, 106 S.Ct. 2505.
 

 III. DISCUSSION
 

 a)
 
 Enforcement of State Court Judgment
 

 The Plaintiff contends that full faith and credit requires the Court to enforce the judgment against Defendants Star and Meadowbrook, neither of whom were parties to the state court action. The Full Faith and Credit Statute, 28 U.S.C. § 1738 (1994), obligates a federal couit to determine whether a prior judgment has either an issue or claim preclusive effect.
 
 See Dionne v. Mayor and City Council of Baltimore,
 
 40 F.3d 677, 682 (4th Cir.1994). In
 
 Migra v. Warren City School District Board of Education,
 
 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984), the Supreme Court analyzed the distinction between these two theories of preclusion, explaining that:
 

 Issue preclusion refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided.... Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit.
 

 Id.
 
 at 77 n. 1, 104 S.Ct. 892 (1984). While full faith and credit ordinarily requires a federal court to accord the same weight to state court decisions “as they have by law or usage in the courts of such State,” 28 U.S.C. § 1738 (1994), the federal nature of Miller Act claims necessitates a thorough review of whether a preclusive effect should be given to the state court judgment issued in the instant action.
 

 Section 270b(b) of the Miller Act provides that “[e'lvery suit instituted under this section shall be brought ... in the
 
 *516
 
 United States District Court for any district in which the contract was to be performed and executed and not elsewhere[.]” 40 U.S.C. § 270b(b)(1986). While this subsection has been interpreted as “merely a venue requirement,”
 
 F.D. Rich Co., Inc. v. United States ex rel. Industrial Lumber Company, Inc.,
 
 417 U.S. 116, 125, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974), federal courts are in virtual unanimity that Miller Act jurisdiction is exclusively federal.
 
 See United States ex rel. Owens-Coming Fiberglass Corp. v. Brandt Constr. Co.,
 
 826 F.2d 643, 645 (7th Cir.1987)(observing that Federal courts have held unanimously that Miller Act jurisdiction is exclusively federal and citing cases therein). Thus while the language of § 240b(b) represents a venue provision which may be waived by parties who bring suit
 
 in an inappropriate federal forum,
 
 its classification as a “mere venue requirement” does not empower state courts to exercise jurisdiction over these exclusively federal claims.
 
 Cf. United States ex rel. B & D Mechanical Contractors, Inc. v. St. Paul Mercury Ins. Co.,
 
 70 F.3d 1115, 1117-18 (10th Cir.1995)(refusing to enforce a state court forum selection clause, explaining that “[although parties are able to contractually alter the Miller Act’s provisions, they are not able to change its jurisdictional requirements”). Therefore in order to properly assess whether full faith and credit operates as a bar in the instant action, the Court must consider the jurisdictional implications of the Miller Act’s exclusive federal nature.
 

 Although the Third Circuit has not addressed the issue, both the Fifth and Ninth Circuits have examined the preclu-sive effect that a state court judgment rendered against a general contractor has upon a Miller Act surety. In
 
 United States Fidelity and Guaranty Company v. Hendry Corp.,
 
 the Fifth Circuit refused to enforce a state court judgment which had established a general contractor’s liability against a Miller Act surety. 391 F.2d 13 (5th Cir.1968). Reasoning that Congress had vested the federal courts with exclusive jurisdiction over Miller Act claims, the
 
 Hendry
 
 court found that the surety was not bound by the state court judgment.
 
 See id.
 
 at 18.
 

 A different result was reached in
 
 United States ex rel. Aurora Painting, Inc. v. Fireman’s Fund Ins. Co.,
 
 832 F.2d 1150 (9th Cir.1987). In
 
 Aurora Painting,
 
 the Ninth Circuit held that under the full faith and credit statute, a Miller Act surety was bound by a state court judgment rendered against a principal contractor.
 
 See id.
 
 at 1153. Concluding that “the Miller Act did not, by its terms, create an exception to the full faith and credit statute,” the
 
 Aurora Painting
 
 court held that the state court judgment bound the surety in subsequent federal proceedings.
 
 Id.
 

 The differing views expressed in
 
 Hendry
 
 and
 
 Aurora Painting
 
 provide the Court with little guidance. Given the split between the circuits and the absence of any Supreme Court or Third Circuit opinion directly on point, the Court will examine general principles of issue and claim preclusion in order to reach its conclusion.
 

 1)
 
 Applicability of Claim Preclusion to Miller Act Sureties
 

 In
 
 Marrese v. American Academy of Orthopaedic Surgeons,
 
 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985), the Supreme Court examined the claim preclusive effect that state court judgments have on exclusively federal claims. Addressing the applicability of state court decisions to federal antitrust suits, the Court observed that:
 

 The issue whether there is an exception to [Full Faith and Credit] arises only if state law indicates that litigation of a particular claim or issue should be barred in the subsequent federal proceeding.
 
 To the extent that a state preclusion law indicates that a judgment normally does not have claim preclusive effect as to matters that the court lacked jurisdiction to entertain,
 
 ...
 
 a state court judgment does not bar a subsequent federal antitrust
 
 claim____ Unless application of [state] preclusion law
 
 *517
 
 suggests, contrary to the usual view, that petitioners’ federal antitrust claim is somehow barred, there will be no need to decide ... if there is an exception to § 1738.
 

 Id.
 
 at 383, 105 S.Ct. 1327 (emphasis added).
 

 Thus, in
 
 Marrese
 
 the Supreme Court instructed that when a litigant seeks to use a state court judgment to subsequently bind an adversary regarding an exclusively federal matter, the court must look to the preclusion laws of the state in which judgment was rendered before determining whether any exceptions to full faith and credit are necessary. If the laws of the state in which judgment is rendered do not grant a preclusive effect to matters that the initial court lacked jurisdiction to entertain,
 
 then the federal courts are required by the controlling state law
 
 to find that the subsequent claim is not precluded. In instances where the applicable state preclusion laws require prior jurisdictional competency, it is not necessary to determine whether an exception to full faith and credit applies, because by precluding the claim the court is merely giving the judgment the “same preclusive effect ... that ... would be given in the courts of the State from which the judgment! ] emerged.”
 
 Kremer v. Chemical Constr. Corp.,
 
 456 U.S. 461, 466, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982);
 
 see also Marrese,
 
 470 U.S. at 384, 105 S.Ct. 1327.
 

 In
 
 Nanavati v. Burdette Tomlin Memorial Hospital,
 
 the Third Circuit addressed the claim preclusive effect that New Jersey courts would give to exclusively federal claims. 857 F.2d 96 (3d Cir.1988). Applying the principles of
 
 Marrese
 
 to New Jersey preclusion law, the
 
 Nanavati
 
 court held that a plaintiffs federal antitrust claims were not barred by an earlier state court action.
 
 See id.
 
 at 115. Instrumental in the Third Circuit’s determination was its conclusion that “New Jersey courts ... would follow Restatement (Second) of Judgments approach and would decline to preclude a claim over which the initial court lacked jurisdiction.”
 
 Id.
 

 In the wake of
 
 Nanavati,
 
 it appears clear that the judgment obtained against Hackney does not have a claim preclusive effect upon the Surety Defendants. As noted above, while courts have disputed the exact venue implications of § 270b(b), “(fjederal courts unanimously have read this language as establishing that jurisdiction of Miller Act claims is exclusively federal.”
 
 Owens-Corning,
 
 826 F.2d at 645. In the instant matter the state court, like the state court in
 
 Nanavati,
 
 was unable to exercise jurisdiction over the pending federal claim. Based on the interpretation of New Jersey’s preclusion laws established in
 
 Nanavati,
 
 the Surety Defendants are not barred by the doctrine of claim preclusion.
 

 2)
 
 Applicability of Issue Preclusion to Miller Act Sureties
 

 Similar to the guidelines it set forth for determining the claim preclusive effect of state court judgments, the
 
 Marrese
 
 court instructed district courts faced with claims of issue preclusion to consult the controlling state law in order to determine whether a judgment has an issue preclusive effect.
 
 See Marrese,
 
 470 U.S. at 381-82, 105 S.Ct. 1327. Because New Jersey preclusion law dictates that issue preclusion would not apply to the facts of this case, the Court holds that the state court judgment does not have an issue preclusive effect against the Surety Defendants.
 

 New Jersey caselaw provides that a party seeking to foreclose the relitigation of an issue must show that: 1) the issue is identical; 2) the issue was actually litigated; 3) the judgment relied upon is final; 4) the determination of the issue was essential to the prior judgment; and 5) the party against whom the doctrine is asserted was a party to or in privity with a party in the prior proceedings.
 
 In re Estate of Dawson,
 
 136 N.J. 1, 641 A.2d 1026, 1034-35 (1994). Additionally New Jersey’s Supreme Court has noted that “ ‘the litigant
 
 *518
 
 against whom issue preclusion is invoked
 
 must have had a full and fair opportunity to litigate the issue in the previous tribunal.”’ Id.
 
 (quoting
 
 Pittman v. LaFon-taine,
 
 756 F.Supp. 834, 841 (D.N.J.1991))(emphasis added).
 

 Applying the facts of the instant matter to New Jersey caselaw, it is clear that the Surety Defendants did not have a “full and fair opportunity” to litigate the state court judgment. The Defendants were not named in the state court complaint, nor has PCC submitted any evidence that they were directly informed about the default proceedings.
 
 (See
 
 First Amended Complaint, filed in Gloucester County Law Division on August 14th 1997, attached as Ex. B to Pit’s] Reply Br.) Instead, PCC argues that notice to the principal, Hackney, is sufficient to bind the Surety Defendants. This assertion, however, ignores New Jersey’s laws of preclusion.
 

 In
 
 Monmouth Lumber Co. v. Indemnity Ins. Co. of North America,
 
 21 N.J. 439, 122 A.2d 604, 608 (1956), New Jersey’s supreme court held that a surety who has not been given the opportunity to defend a default judgment rendered against a contractor is not bound by the judgment. The
 
 Monmouth
 
 court reasoned that the failure to join the surety deprived it of the opportunity to defend, thereby rendering the judgment unenforceable.
 
 Id.
 
 at 608. Addressing the judgment’s impact on the litigation, the court explained that “the default judgments ... are not only of little probative significance; in the circumstances of these cases and the rule of this State they are not conclusive against the surety.”
 
 Id.
 

 Here, neither Star nor Meadowbrook were named in the state court action, nor is there any evidence that they were informed of the default proceedings against Hackney. Like the sureties in
 
 Monmouth,
 
 the Defendants were not given a full and fair opportunity to litigate the issues decided in the previous state court action and are therefore not barred by the doctrine of issue preclusion.
 
 [2]
 
 Accordingly PCC’s motion for summary judgment seeking enforcement of the state court judgment is denied.
 

 b)
 
 Joint Venture
 

 The Surety Defendants claim that the relationship between Hackney and PCC precludes the Plaintiff from seeking Miller Act protection. The issue of whether PCC qualifies as a “subcontractor” under the Miller Act is governed by federal law.
 
 See F.D. Rich Co., Inc. v. United States ex rel. Industrial Lumber Co., Inc.,
 
 417 U.S. 116, 127, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974);
 
 see also United States ex rel. Woodington Electric Co., Inc.,
 
 545 F.2d 1381, 1382 (4th Cir.1976)(applying federal law to determine whether plaintiff was a joint venturer). The Supreme Court has explained that determination of whether a party may be considered a subcontractor hinges upon the substantiality and importance of the relationship with the prime contractor.
 
 Rich,
 
 417 U.S. at 123, 94 S.Ct. 2157. Although a Miller Act bond holds a surety hable for labor and materials furnished by a subcontractor when the general contractor defaults, sureties are not liable for monies expended on the contract by a partner or joint venturer of the general.
 
 See Woodington,
 
 545 F.2d at 1382;
 
 United States of America ex rel. Briggs v. Grubb,
 
 358 F.2d 508, 512 (9th Cir.1966);
 
 St. Paul-Mercury Indem. Co. v. United States of America ex rel. Jones,
 
 238 F.2d 917, 921 (10th Cir.1956). In their counterclaim against PCC, Defendants Star and Meadowbrook assert that Hackney and PCC were joint venturers, thereby barring PCC from claiming any rights under the bond.
 
 (See
 
 Defs.[’] Counterclaim, dated May 12th, 1999, at ¶¶ 1-13)
 
 *519
 
 Arguing that the Defendants have not proffered sufficient evidence supporting this assertion, PCC moves for dismissal of the Defendants’ joint venture claims.
 

 Courts have noted that “[pjrecise definition of a joint venture is difficult. The cases are of little help since they are generally restricted to their own peculiar facts. Each case ... depends of course for its results on its own facts, and owing to the multifariousness of facts, no case of coadventure rises higher than a persuasive precedent for another.”
 
 United States v. Standard Oil Company of California,
 
 155 F.Supp. 121, 148 (S.D.N.Y.1957),
 
 aff'd,
 
 270 F.2d 50 (2d Cir.1959). While there does not appear to be a hard and fast rule for determining whether a joint venture exists, courts addressing the issue have generally examined the agreements between the parties, as well as their conduct during the relevant time period.
 
 See Woodington,
 
 545 F.2d at 1383;
 
 Grubb,
 
 858 F.2d at 512. Some key factors courts have identified as indicative of such a relationship are a mutuality of control and an agreement to share in the profits (or losses) of the venture.
 
 See Woodington,
 
 545 F.2d at 1383(focusing on mutuality of control and sharing of losses).
 

 Here a review of the Agreement between the parties supports PCC’s contention that a traditional subcontractor-general contractor relationship existed. The contract, which was entitled “Subcontractor Agreement Between Contract and Subcontract,” expressly designated Hackney as the contractor and PCC as the subcontractor. (Nee Agreement at 1) In addition, the Agreement specifically detailed the work to be performed by PCC and provided that Hackney would pay the Plaintiff a fixed amount of $ 427,000.
 
 (See
 
 Agreement at Article 2 & 7) Moreover, absent from the contract was any language regarding the sharing of profits and losses.
 
 (See generally
 
 Agreement) Thus focusing solely upon the language in the Agreement, it would appear that PCC qualifies as a subcontractor under the Miller Act.
 

 However as caselaw instructs, the inquiry does not end there. Before it can be determined whether a joint venture exists, the Court must examine the conduct of the parties.
 
 See St. Paul-Mercury,
 
 238 F.2d at 921 (noting that “[tjhe true relationship must be determined
 
 by the conduct of the parties,
 
 together with all other material facts and circumstances”)(emphasis added). In opposition to the instant motion, the Defendants have submitted several documents signed by PCC’s President Fred Altimore (“Altimore”) on behalf of Hackney as contract administrator.
 
 (See
 
 Exs. F & G, attached to Aff. of Martin L. Borosko) Many of the documents consist of Hackney’s payment requests to the government. Comparing these documents to PCC’s invoices for the relevant time periods, it appears that PCC received 100% of the amounts requested by Hackney.
 
 (Compare
 
 Exs. F & G, attached to Borosko Aff.
 
 with
 
 Exs. H & I, attached to same) While an affidavit submitted by Altimore asserts that there was no joint venture and that subcontractors often agree to serve as contract administrators for the general, the Court finds that the Defendants’ submissions create a question of fact as to whether the relationship went beyond the boundaries contemplated within the Agreement. (See Aff. of Fred Altimore (“Altimore Aff.”) at ¶¶ 9-11)
 

 In addition to the aforementioned documents, Defendants’ counsel, Martin L. Borosko, Esq., has submitted an affidavit which attests to conversations he had with Altimore.
 
 [3]
 
 Borosko claims that during these discussions, Altimore revealed that PCC’s employees were placed on Hackney’s payroll. (See Aff. of Martin L. Borosko, Esq. (“Borosko Aff.”) at ¶ 12) In
 
 United States ex rel. Briggs v. Grubb,
 
 358 F.2d 508, 512 (9th Cir.1966), the Ninth Circuit focused upon one party’s assumption of the other entity’s payroll as a key factor in its finding that a joint venture
 
 *520
 
 existed. Although the Court recognizes that the facts were reversed in
 
 Grubb,
 
 where the subcontractor assumed the payroll of the general, it finds this a distinction without a difference in that the end result was a commingling of fiscal responsibilities between the allegedly separate entities. An additional factor in the
 
 Grubb
 
 court’s calculus was the subcontractor’s control over all project related billing, a situation arguably analogous to the instant action, where Altimore served as the contract administrator.
 
 [4]
 

 See id.
 

 Defendants have also submitted a letter sent to Plaintiff by John Starn, identified by Altimore as Hackney’s project manager.
 
 (See
 
 Altimore Aff. at ¶ 12) In the letter Starn sought compensation from PCC for past due amounts from the project.
 
 (See
 
 Ex. D, attached to Borosko Aff.) Pursuant to the parties’ Agreement, PCC was required to perform to the satisfaction of Hackney’s Project Manager — a/k/a Starn.
 
 (See
 
 Agreement at Attachment “A,” ¶ 1) Thus it appears that Starn, the person charged with authorizing Hackney’s approval, was seeking compensation from PCC, the subcontractor whose work he was required to review. While the . Court recognizes that subcontractors and generals typically have a close working relationship, the evidence submitted by the Surety Defendants creates a question of fact as to whether the parties’ conduct transcended these traditional boundaries.
 

 Relying upon
 
 United States ex rel. Woodington Electric Co. v. United Pacific Insurance Co.,
 
 the Plaintiff argues that a joint venture can not be found absent an express or implied agreement to share losses. 545 F.2d 1381, 1383 (4th Cir.1976). Although it is conceded that an agreement to share in profits or losses represents an integral part of a joint venture, the Court finds that the parties’ conduct supports a reasonable inference that such an agreement existed. Here, the Defendants’ submissions support their assertion that both parties assumed debts normally attributed to the other party. A reasonable inference of such conduct is that an implied agreement to share in losses associated with the endeavor existed.
 
 Cf. United States ex rel. Walker v. United States Fidelity & Guaranty Co.,
 
 4 F.Supp. 854, 855 (D.Wyo.1933)(finding that commingling of funds gave rise to a joint venture). Moreover, the organizational “overlap” resulting from Altimore’s role as contract administrator and Starn’s apparent attempt to seek compensation from PCC further serves to confuse the distinctions between the two entities. This blurring of fiscal and organizational responsibilities creates a reasonable basis upon which a juror could conclude that the relationship between PCC and Hackney resulted in a joint venture between the parties.
 
 [5]
 

 
 *521
 
 In
 
 Hellenic Lines Ltd. v. Commodities Bagging & Shipping, Process Supply Co., Inc.,
 
 611 F.Supp. 665 (D.N.J.1985), the court addressed a fairly analogous situation. The
 
 Hellenic
 
 court held that, despite the parties’ assertions to the contrary, a joint venture existed.
 
 Id.
 
 at 681. Instrumental to the decision was the court’s conclusion that “[i]f the defendants had been ‘independent contractors’ engaging in separate interlocking activities, the court does not believe there would have been such a blurring of functions and payments[.]”
 
 Id.
 
 While the Court recognizes that the facts are not identical and that
 
 Hellenic
 
 is not a Miller Act case, it nonetheless finds the court’s reasoning applicable here, where the blurring of the parties’ identities supports a reasonable inference that an implied agreement to share in the success or failure of the business existed.
 

 Arguing that the Defendants’ opposition represents the “unsupported statements of counsel,” PCC contends that the Defendants’ submissions are insufficient because the affiant, Borosko, has no personal knowledge of the facts at issue. Plaintiffs argument, however, ignores both the facts and contents of the Defendants’ submissions. As discussed above, Borosko’s affidavit asserts that Altimore told him PCC’s employees were on the payroll of Hackney. Through this alleged conversation with Al-timore, Borosko has clearly acquired personal knowledge relevant to the administration of PCC’s payroll, a fact material to the joint venture issue.
 
 [6]
 

 Moreover, the Defendants have submitted numerous documents that the Court has relied upon in reaching its determination. These documents are attached to Borosko’s affidavit, which attests to his personal knowledge regarding the source from which he obtained the documents, many of which were provided directly by PCC.
 
 (See
 
 Borosko Aff. at ¶ 5) The Court finds that these submissions satisfy the demands of Rule 56(e), which merely requires that the nonmoving party “produce evidence in a form that would be admissible
 
 at trial.” Celotex Corp. v. Calrett,
 
 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(emphasis added);
 
 cf. McQueeney v. Wilmington Trust Co.,
 
 779 F.2d 916, 929 (3d Cir.1985)(explaining that the authentication of documents at trial imposes a slight burden of proof that can be satisfied circumstantially, and that copies produced by a party pursuant to an adversary’s request for documentation “while not dispositive, is surely probative” of authenticity). As discussed
 
 supra,
 
 these submissions provide ample support for the Defendants’ joint venture claim, thus assuring that it does not “ ‘rest upon mere allegations, general denials, or ... vague statements.’ ”
 
 Lo Bosco v. Kure Eng’g Ltd.,
 
 891 F.Supp. 1020, 1025
 
 (D.N.J.1995)(quoting Quiroga v. Hasbro, Inc.,
 
 934 F.2d 497, 500 (3d Cir.1991)). Therefore, PCC’s argument that the parties’ submissions are insufficient is rejected.
 

 Viewing the evidencie in the light most favorable to the nonmoving party, the Court concludes that Defendants have satisfied their burden by submitting sufficient evidence upon which the trier of fact could conclude that a joint venture more probably than not existed. Therefore the Plaintiffs motion seeking summary judgment as to the existence of a joint venture between PCC and Hackney is denied.
 

 c)
 
 Defendants’ Crossmotion to Dismiss Meadowbrook
 

 In their opposition, Defendants crossmoved for summary judgment, seeking the dismissal of Meadowbrook as a defendant in the action. The Defendants
 
 *522
 
 cite no caselaw in support of their motion, instead relying upon the fact that Star’s name, and not Meadowbrook’s, appears on the bond. This argument ignores the nature of PCC’s claims against Meadow-brook, which are grounded, at least in part, upon agency principles.
 
 (See
 
 First Amended Complaint at ¶ 3) Because PCC’s claim against Meadowbrook is based upon a theory of agency, PCC need not show that an express agreement existed between Meadowbrook and Hackney.
 
 [7]
 

 In opposition, PCC has submitted documentary evidence which establishes that Meadowbrook took an active role in the processing of PCC’s claim under the bond.
 
 (See
 
 Ex. D, Letter from Alan Pavuc, Director of Claims for Meadowbrook Insurance Company to PCC Construction, Inc. (Jan. 15th 1997), attached as Ex. D to Altimore Aff.) Moreover, included at the bottom of Meadowbrook’s letterhead are the names of various insurance companies, including Star’s. This evidence supports a reasonable inference that some type of agency relationship exists between Star and Meadowbrook. Accordingly, the Defendants’ crossmotion for summary judgment seeking the dismissal of Meadow-brook is denied.
 

 IV. CONCLUSION
 

 For the reasons stated above, the Plaintiffs Motion for Summary Judgment and the Defendant’s Crossmotion for Summary Judgment are both denied.
 

 [1]
 

 . While both parties joined in the answer, only Defendant Star filed a counterclaim against PCC.
 

 [2]
 

 . PCC contends that the Defendants' "lack of notice” arguments were waived because they were not included in the Defendants' answer. The Court rejects this contention, noting that the default judgment upon which the lack of notice is based was never mentioned in the Plaintiff's complaint.
 

 [3]
 

 . Defendant Star did not have an opportunity to depose Mr. Altimore prior to the motion.
 

 [4]
 

 . In his affidavit, Altimore contends that his agreement to serve as Hackney's contract administrator was a personal agreement that did not involve PCC. However, documents submitted by the Defendants create a question of fact as to whether or not this is the case. In a January 15th 1999 letter, Plaintiff's counsel itemized each portion of the state court judgment rendered on PCC’s behalf against Hackney. In the letter, PCC's attorney allocated $10,000 to "superintendent fees.”
 
 (See
 
 Letter from Charles J. Sprigman, Jr., Esq., Atty. for PCC, to Martin L. Borosko, Esq., Atty. for Star & Meadowbrook (Jan. 15th 1999)) In a subsequent fax from Altimore to PCC’s counsel, Altimore explained that "[t]he $10,000 superintendent fees is for my participation on the project.” ( Fax from Fred M. Altimore to Jeff Sprigman (March 3 1999)) Thus it appears that, at least for purposes of its state court claim, PCC considered Alti-more's participation on the project an integral part of its agreement with Hackney. This position is consistent with the language of the Agreement which provides that "Hackney will reimburse PCC for their supervisor costs of $10,000 for the total project.” (Agreement at Add. A, 1Í B)
 

 [5]
 

 . In support of its position that no joint venture exists, PCC relies upon Hackney’s pleadings in the state court case. Because the Court has determined that neither claim or issue preclusion applies, Hackney’s pleadings do not bind the Defendants. Consistent with Rule 56, the Court must view the evidence in the light most favorable to the nonmoving party and resolve all factual disputes in their favor.
 
 See Taylor v. Phoenixville Sch. Dist.,
 
 184 F.3d 296, 309 (3d Cir.1999). Since the
 
 *521
 
 Defendants have succeeded in creating a question of fact as to the relationship between PCC and Hackney, the Court must resolve the conflicting evidence in favor of the nonmov-ing party for purposes of this motion.
 

 [6]
 

 . Given Altimore’s role as president of PCC, his statement would arguably be admissible at trial as an admission by a party opponent.
 
 See
 
 Fed.R.Evid. 801(d)(2).
 

 [7]
 

 . Since the Defendants’ crossmotion did not address the legal ramifications that an agency finding would have on this type of case, the Court refuses to do so now.